defendants acted in bad faith, and without jurisdiction of the subject-matter, in making the assessment complained of herein; and the relator, having paid the tax for the year 1900, is entitled to reimbursement for such tax so wrongfully and illegally assessed against it and paid by it.

The court therefore decides that relator should have judgment: First, that the relator was organized exclusively for the moral and mental improvement of men, and for library, literary, scientific, and educational purposes; second, that the real property of relator, assessed at $3,500, was at the time of such assessment, and had been, used exclusively for carrying out thereupon all of the purposes for which relator was organized; third, that the real property of relator, assessed by defendants for $3,500, was exempt from taxation, and is exempt so long as it continues to be so used, and that said assessment should have been stricken from the assessment roll of the town for the year 1900; fourth, that relator should be reimbursed for the tax so illegally assessed and paid by it for the year 1900; fifth, that the relator have costs hereby allowed as upon the trial of an issue of fact in this court against defendants, E. F. Lawlor, Wayne V. Keith, and W. H. Brockway, personally, and judgment is hereby directed to be entered accordingly.

Judgment accordingly.

(66 App. Div. 434.)

## CAMPBELL v. UPTON.

(Supreme Court, Appellate Division, Fourth Department. November 12, 1901.)

BANK DRAFT—FRAUD OF CASHIER—RECOVERY FROM PAYEE.

A cashier of a bank under its by-laws had power to sign drafts in favor of the bank on its correspondent. There was no rule of the bank forbidding him to obtain drafts for his own use, and he had been allowed to overdraw his personal account. *Held*, that where he paid for personal property, when his account was overdrawn, with a draft on the correspondent of the bank, payable to the order of the vendor, and signed by him as cashier, and fraudulently entered the draft at a sum much less than its face, the bank could not recover the difference from the payee of the draft.

Appeal from trial term, Monroe county.

Action by Edward S. Campbell, receiver of the Middlesex County Bank, against Frederick A. Upton. From a judgment for defendant, plaintiff appeals. Affirmed.

The following is the opinion of the court below (NASH, J.):

In September, 1898, George M. Valentine, who was then the cashier of the Middlesex County Bank, of Perth Amboy, N. J., entered into negotiations with the defendant, a resident of Rochester, N. Y., for the purchase of a team of horses, which negotiations were carried on by telegraph and mail, and which resulted in an agreement as to the price. On the 10th day of September, 1898, Valentine mailed to the defendant at Rochester the draft of the Middlesex County Bank, dated the 10th day of September, 1898, drawn upon its correspondent, the National Park Bank of New York City, for the sum of $1,450, payable to the order of the defendant, and signed by himself as cashier. The parties, Valentine and this defendant, were strangers, and in the letter accompanying the draft Valentine stated to the defendant: "Wait and get your money on your draft, and when you get the money ship-

the horses. You do not know me." Upon receipt of the draft the defendant indorsed it to the Traders' Bank of Rochester for collection. The draft was paid by the National Park Bank, and upon the receipt of the avails of the draft the defendant shipped the horses to Valentine at Perth Amboy, where they were used by him for his private purposes, and kept in his own stable. When the defendant received the draft and used it, he saw that it was signed, "George M. Valentine, Cashier." In 1892 Valentine became cashier of the bank, and was such until its failure in July, 1899. From the year he began to be cashier he commenced plundering the bank, stealing its assets, which continued to the time of its failure, which was for some $250,000, all traceable to his acts as cashier. He had an account at the bank during the time he was cashier, subject to his check the same as any customer of the bank. He made drafts in the name of the bank upon its correspondent in New York, payable to his own order, signed by himself as cashier,—some 50 in all,—while he was cashier. Of these 20 or 25 were properly entered upon the stub in the draft book, and the amount of the draft paid into the bank. Some of these drafts were filled out,—the draft and stub, by the clerk of the bank. The remainder of the 50 were filled out by Valentine, the amount entered by him on the stub being much less than the amount of the draft, instances of which are as follows: Drafts full amount entered upon the stub, May 5, 1898, $2,500; May 14, 1898, $2,500. On July 13, 1898, a draft for $2,500; amount entered on the stub, only $15. July 19, 1898, draft for $3,090; stub, $50. August 9, 1898, draft, $5,000; stub, $25. The account of Valentine was much of the time largely overdrawn. The amount of his overdraft on the 10th of September, 1898, was $950.79. On the 28th day of September, 1898, it was overdrawn $2,148.48, and from that date to the 30th day of December, 1898, his account was continuously overdrawn. The debit balances during that period ranged from the amount last mentioned to the sum of $19,192.12, which was the amount of his debit balance on December 30, 1898. On December 31, 1898, Valentine's account was credited with a demand loan of $23,000, which proved to be a total loss to the bank. From December 31, 1898, to the time of the failure of the bank in July, 1899, the credit and debit balances of the account alternated; the debit balance at the time the bank closed its doors, July 13, 1899, being $5.94. From time to time during the running of the account, loans of the assets of the bank were made to Valentine by the directors. At the time the draft was issued to the defendant, Valentine paid into the bank $50; and this amount was entered upon the stub of the draft, so that the draft was made use of to steal $1,400 of the bank's money.

The amount thus stolen by Valentine from the bank is sought to be recovered of the defendant upon the ground that Valentine, as cashier, had no authority to issue the bank's draft for his own use, within the fundamental doctrine that the agent cannot act for himself and his principal at the same time. While it is true that the agent cannot acquire or take any advantage to himself in any of his dealings with the property of the principal, there are cases where the course of business permitted by the principal, or the authority conferred by the principal upon the agent, is such that as to third persons the principal may be bound in cases where the agent has appropriated the property or credit of the principal to the discharge of the obligation of the agent. This was so held in the case of Goshen Nat. Bank v. State, 141 N. Y. 379, 36 N. E. 316, which, it seems to me. cannot be distinguished from this in its facts and circumstances and the principle applicable thereto. The court in its opinion there said in regard to a draft drawn by the cashier of the bank upon its correspondent bank, where the cashier paid nothing into the bank for the draft, and made no entry of the draft in the books of the bank, and had no money to his credit on deposit: "We do not think that, in the case of a bank draft so drawn, the party receiving it would be charged with the duty of inquiry, or with notice of the fact that the cashier had not paid for the draft, and that he was therefore using the funds of the bank to pay his private debt. He would only be so using them in case he did not pay for the draft, and its form might be the same even if he had paid for it in full. We think there is nothing unusual or suspicious in this form of making the draft payable direct to the creditor

of the cashier, nor any notice that in so doing the bank's funds have been improperly used. Bank or cashier's drafts are used so enormously at the present time in the payment or settlement of debts and in other commercial transactions that they have almost acquired the characteristics of money. So long as they are drawn on behalf of a solvent bank and upon a solvent drawee, and signed by one of the officers usually signing such instruments, they are regarded by the commercial community very much the same as so much cash; and the fact that the draft was drawn by a cashier directly in favor of his own creditor, and sent to that creditor by him, would not naturally give rise even to the suspicion that there was anything irregular, fraudulent, or wrong in the conduct of the cashier. The presumption would be that he had performed his duty and paid for the draft, and that it, therefore, was his property." That case is sought to be distinguished because it is said that there it was shown that the cashier had the right to draw a draft on the corresponding bank upon the same terms that he had to draw a draft for a stranger. In regard to this it was there said: "It is the right and duty of the cashier of a bank to sign the drafts drawn in its behalf upon its corresponding bank. This is part of the ordinary duties of such an officer, and affirmative evidence of his power to sign drafts appears in this record; and it also appears that he had the right to draw such draft for himself upon the same terms that he would have had in case of a third party, which means, I assume, upon payment to the bank of the amount of the draft." It appears here that Valentine had the same right. The by-laws of the Middlesex Bank provide that all drafts, etc., should be signed by the president or cashier, and the proof is that only in the absence of the cashier were drafts signed by the president. There never was any rule adopted forbidding the president or cashier from obtaining drafts for their own use. The president and directors carried personal accounts on the books, and it was understood that they and the cashier could have drafts in payment of their checks. The cashier issued to himself checks for large amounts, some twenty or twenty-five in number, during his cashiership, for which he paid into the bank the face of the drafts; and there was about the same number issued for which he paid and entered upon the stub a sum much less than the amount of the draft. As the president testified, Valentine could pay himself the checks drawn by him upon his account, and the course of the business was such that the fact of his account being good or overdrawn did not matter. He seemed to have had carte blanche to draw for his own use as much as he chose from the assets of the bank. He could pay his own checks payable to himself in money, and, if in money, it is difficult to conceive why not by draft. All that was required to make the transaction with Upton perfect and within the authority actually conferred upon Valentine by the course of the business would have been his check for the amount of the draft.

I think it must be held here, as in the Goshen Nat. Bank Case, as stated by Judge Peckham, referring to that case (Bank of New York National Banking Ass'n v. American Dock & Trust Co., 143 N. Y. 564, 38 N. E. 713), that Valentine, as cashier, "had power to draw drafts for his own use, or payable to his own order, upon the same terms that he had to draw a draft for a stranger, viz., upon payment to the bank of the amount of the draft"; that "when the cashier issued such a draft he was acting within the scope of his apparent authority, and the very act of issuing the draft was a representation of the existence of the fact that the draft was paid for." In the opinion, in an action brought by the same plaintiff in the state of New Jersey, but differing widely in its material facts and circumstances from the case here, it is said that the language of the opinion in the Goshen Nat. Bank Case was unnecessarily broad, from the fact that the debt paid by the draft in that case was not the individual debt of the cashier, but was a debt of Orange county to the state of New York for taxes held by the cashier as county treasurer. It nevertheless was the debt of the cashier,—one for which an action would lie against the county treasurer and his sureties. It was regarded by the court, as the fact was, that it was the private debt of the county treasurer. The draft was made payable to the comptroller by the cashier in the discharge of his own obligation, appro-

priating the funds of the bank for that purpose. The fact that Valentine was permitted to overdraw his account and appropriate the assets of the bank to his own use brings the case here within the principle of the case of Hanover Nat. Bank of City of New York v. American Dock & Trust Co., 148 N. Y. 612, 43 N. E. 72, 51 Am. St. Rep. 721, where the defendant was held liable upon a warehouse certificate for goods deposited, issued by an officer in his own favor, where no goods had been in fact deposited; it appearing that the officer in the course of the business had issued certificates to himself, to the knowledge of the company's directors, either express or implied.

The complaint should be dismissed upon the merits. Findings may be submitted.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WILLIAMS, and HISCOCK, JJ.

Albert H. Harris, for appellant.
George P. Decker, for respondent.

PER CURIAM. Judgment affirmed, with costs, on opinion of NASH, J., delivered at trial term.

---

(36 Misc. Rep. 583.)

HACKETT et al. v. NORTHERN PAC. RY. CO.

(Supreme Court, Special Term, New York County. December, 1901.)

1. RAILROAD CORPORATIONS—PREFERRED STOCK—CONDITIONS.
   Where a railway corporation is authorized to issue preferred stock, on a vote of a majority of its stockholders, without any conditions, the corporation may attach such conditions as it chooses; and they, when agreed to by the holders of such stock, become the contract between it and them.

2. SAME—VALIDITY.
   A condition for the issue of preferred stock by a railway company that the corporation may retire the same on any 1st day of January prior to 1917 is valid.

3. SAME—RETIREMENT.
   Where the act of incorporation of a railroad company authorized it to issue preferred stock, convertible into common stock at the option of the corporation, it may retire preferred stock at par, and issue common stock instead; giving the holders of the common stock the privilege of acquiring the additional common stock.

4. SAME—RIGHTS OF PREFERRED STOCKHOLDERS.
   Where a railroad company is authorized to retire its preferred stock at par, the holders thereof cannot enjoin such plan on the ground that it will reduce the capital of the corporation, inasmuch as such reduction will accrue after they have ceased to have any interest in the corporation.

5. SAME—EXERCISE OF OPTION.
   Where a railway charter provides for the management of its affairs by its directors, and they are invested with all the powers of the corporation, "except as hereinafter provided," and the charter also authorizes the retirement of the preferred stock, a resolution of the board retiring all the preferred stock at par January 1, 1902, is a valid exercise of this option by the corporation.

6. SAME—EFFECT.
   The exercise of the right to retire the preferred stock does not effect an organic change in the business of the corporation.